IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| JOHN LARRY SANDERS and<br>SPECIALTY FERTILIZER PRODUCTS, LLC,<br><br>       Plaintiffs/Counterclaim<br>       Defendants,<br><br>v.<br><br>THE MOSAIC COMPANY; CARGILL, INC.;<br>and CARGILL FERTILIZER, INC.,<br><br>       Defendants/Counterclaim<br>       Plaintiffs. | Civil File No. 4:09-cv-00016-JTM<br><br>**DEFENDANTS' SECOND<br>AMENDED COUNTERCLAIM** |

Defendants/Counterclaim Plaintiffs, The Mosaic Company; Cargill, Inc.; and Cargill Fertilizer, Inc. (collectively "Defendants), submit the following Second Amended Counterclaim against Plaintiffs/Counterclaim Defendants John Larry Sanders ("Sanders") and Specialty Fertilizer, Inc. ("Specialty Fertilizer" or "SFP") (collectively "Plaintiffs"):

### COUNTERCLAIMS

For their Second Amended Counterclaim against Plaintiffs, Defendants state and allege as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    The Mosaic Company is a Delaware corporation with a principal place of business in Plymouth, Minnesota.

2.    Cargill, Inc. is a Delaware corporation with a principal place of business in Minnetonka, Minnesota.

3.    Cargill Fertilizer, Inc. is a Delaware corporation with a principal place of business in Minnetonka, Minnesota.

4. On information and belief, John Larry Sanders is an individual residing in Leawood, Kansas.

5. On information and belief, Specialty Fertilizer Products, LLC is an Ohio limited liability company with a principal place of business in Leawood, Kansas.

6. This is a Counterclaim for declaratory judgment that Defendants have not and do not infringe any claims of the '459 patent, that such claims are invalid under the patent laws of the United States, 35 U.S.C. §§ 102, 103, and 112, and that the '459 patent is unenforceable. Plaintiffs have filed suit against Defendants alleging infringement of the '459 patent, and Defendants deny such infringement. Therefore, there is an actual and justiciable controversy between the parties relating to infringement, validity, and enforceability of the '459 patent.

7. This Court has subject matter jurisdiction over these Counterclaims under 28 U.S.C. §§ 1331, 1338(a), and 2201.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## COUNT I
### Declaration of Non-infringement

9. Paragraphs 1-8 of Defendants' Counterclaim are incorporated by reference.

10. Defendants have not infringed, and are not infringing, any valid claim of the '459 patent.

11. Defendants are entitled to a declaratory judgment that their actions do not directly infringe, contributorily infringe, or induce infringement of any claim of the '459 patent.

## COUNT II
### Declaration of Invalidity

12. Paragraphs 1-11 of Defendants' Counterclaim are incorporated by reference.

13. Claims 3, 4, 7, 8, and 13-16 of the '459 patent fail to satisfy the conditions of patentability set forth in 35 U.S.C. §§ 102, 103, and/or 112.

14. Defendants are entitled to a declaratory judgment that all asserted claims of the '459 patent are invalid.

## COUNT III
### Declaration of Unforceability

15. Paragraphs 1-14 of Defendants' Counterclaim are incorporated by reference.

16. For the reasons stated below, the '459 patent is unenforceable, and Plaintiffs are estopped and barred from enforcing it.

17. The '459 patent is unenforceable because of the conduct of patentee Sanders and his agents and affiliates before the United States Patent and Trademark Office ("Patent Office"). The '459 patent was procured through inequitable conduct.

18. In prosecuting the '459 patent, Sanders and his agents were under a duty of candor and good faith, including a duty of disclosure, in dealing with the Patent Office.

19. During the prosecution of the '459 patent, Sanders and his agents, including his attorneys, intentionally misled the Patent Office through intentional false and/or misleading statements and intentional failures to disclose material information.

20. The intentional false and/or misleading material statements and omissions described are material to every claim in the '459 patent that Plaintiffs have asserted against Defendants. The statements and omissions are material principally because they relate to, and determine, the scope of the claim terms "soil nutrient composition comprising . . . a micronutrient" and "composite comprising a self-sustaining body formed of a mixture comprising . . . a micronutrient," terms that are a component of every claim asserted against Defendants. Sanders and his counsel communicated to the Patent Office that those terms

3
Case 4:09-cv-00016-JTM   Document 94   Filed 06/03/10   Page 3 of 16

excluded fertilizers with less than about a 5% concentration of micronutrients by weight but later argued that the '459 patent should re-capture fertilizer compositions and composites that their prior admissions excluded.

## Dr. Murphy's Undisclosed Affiliations With Sanders and Specialty Fertilizer

21. On June 27, 2000, following the rejection of claims similar to those Plaintiffs now assert against Defendants, Sanders filed a continuation patent application supported by a June 20, 2001, Declaration from Dr. Larry S. Murphy. The facts and opinions stated in the Murphy Declaration were material to patentability of the asserted claims of the '459 patent, principally because they related to the level of micronutrients necessary to fall within the scope of the claimed fertilizers. The admissions as to patent scope Plaintiffs had made prior to the submission of the Declaration, among other things, alone establish noninfringement by Defendants' products.

22. The Murphy Declaration was presented as the statement of an independent expert. Dr. Murphy identified himself as "President, Fluid Fertilizer Foundation," attached a *curriculum vitae*, stated that he possessed "expertise in the areas of soil fertilizers and related technologies," and stated that he had been asked to review a prior art reference, the Bexton '303 patent, and use his expertise to render several expert opinions.

23. In fact, at the time of his Declaration, Dr. Murphy had undisclosed material existing business and personal relationships with Sanders and his company, in at least the following respects:

    (a) Dr. Murphy was simultaneously serving as the "Consulting Agronomist" for Specialty Fertilizer;

4
Case 4:09-cv-00016-JTM   Document 94   Filed 06/03/10   Page 4 of 16

(b)     Dr. Murphy had been a paid consultant for Specialty Fertilizer from the time the company was first formed;

(c)     Dr. Murphy's contracted services to Specialty Fertilizer included work to "[d]esign, establish and monitor studies" "for SFP product development," "to provide performance data on SFP products," and "to provide sales support information for SFP," among other services;

(d)     Dr. Murphy's services to Specialty Fertilizer included review of, comments on, and revisions and additions to the '459 patent application before it was filed;

(e)     Specialty Fertilizer was paying Dr. Murphy, according to IRS Forms 1099-MISC issued by Specialty Fertilizer, the sums of $88,746.10 in 1999 and $127,297.82 in 2000;

(f)     those amounts included compensation to Dr. Murphy personally at a rate of at least approximately $900 per day and $7,200 per month;

(g)     Dr. Murphy was devoting approximately 30 percent of his time to his paid consultant work for Specialty Fertilizer;

(h)     Dr. Murphy was receiving nearly half of his total annual income from Specialty Fertilizer;

(i)     Dr. Murphy and Sanders had co-authored articles together;

(j)     Dr. Murphy was a personal friend of Sanders;

(k)     Sanders referred to Specialty Fertilizer as being his and Dr. Murphy's company; and

5

    (l)  significant portions of the Murphy Declaration had actually been written by an employee of Specialty Fertilizer, according to the Specialty Fertilizer employee, who has stated in writing that Dr. Murphy "basically restated my memo under his signature."

  24. Not the Murphy Declaration, nor the attached *curriculum vitae*, nor any other materials submitted to the Patent Office by Sanders or his agents, included any of those material facts regarding the true business and personal relationships of Dr. Murphy and his Declaration to Sanders and his company. Although Dr. Murphy listed 149 publications in the *curriculum vitae* he submitted to the Patent Office, the articles he co-authored with Sanders were not included.

  25. Sanders, his patent counsel, John M. Collins, and Dr. Murphy caused the Murphy Declaration to be submitted to the Patent Office without disclosing any of the relationships among Specialty Fertilizer, Sanders, and Dr. Murphy. The failure of Sanders and his agents to disclose Dr. Murphy's true relationships with Sanders and Specialty Fertilizer was an intentional and material omission and misrepresentation to the Patent Office and constitutes inequitable conduct and unclean hands sufficient to render the '459 unenforceable.

  26. Following the submission of the Murphy Declaration, Dr. Murphy's relationship with Specialty Fertilizer continued and expanded. He remained "Consulting Agronomist" to the company. He eventually became a full-time consultant to the company, devoting all his time to it. He provided a marketing column under Specialty Fertilizer's name entitled "ASK THE AGRONOMIST." Plaintiffs endowed a scholarship in his name at Kansas State University.

### False and Misleading Statements in the Murphy Declaration

  27. Sanders and Mr. Collins filed a continuation application that issued as the '459 patent with a preliminary amendment and a Declaration by Dr. Murphy. The Declaration was

6

directed to distinguishing the subject matter of the '459 patent over the Bexton '303 patent, which had been previously addressed by Sanders and Mr. Collins in the application for the parent to the '459 patent.

28. In an interview with the Patent Examiner, Sanders and Mr. Collins, amongst others, had distinguished the parent application of the '459 patent over the Bexton '303 patent on the ground that the fertilizer in the Bexton '303 patent had a maximum micronutrient concentration of 5% by weight of the fertilizer.

29. Dr. Murphy's Declaration to the Patent Office contained at least the following material false and/or misleading statements, in addition to his failure to disclose his ties to Sanders and Specialty Fertilizer:

    (a) The Murphy Declaration quotes the Bexton '303 patent as describing its fertilizer as "sulfur-based," states that "[c]learly, both the Bexton patent and Exhibit B teach those skilled in the art that elemental sulfur is a base material and that a relatively small proportion of sulfate may be provided as a readily available sulfur source," and further states that, in Dr. Murphy's opinion, "the 'sulfur-based fertilizers referred to in the Bexton patent refers to fertilizers having at least a preponderance of elemental sulfur therein, and probably at least about 75% elemental sulfur therein.'" In fact, contrary to Dr. Murphy's representation, the Bexton '303 patent explicitly defines the phrase "sulfur-based fertilizers" as any "fertilizer which contains elemental sulfur." '303 patent at column 3, lines 7-9. Dr. Murphy's description of the elemental sulfur content in the Bexton patent was untrue.

    (b) In arguing that the prior art teaches that only "a relatively small proportion of sulfate may be provided as a readily available sulfur source," the Murphy Declaration

7

cites, in addition to the Bexton '303 patent, an attached Exhibit B, a Technical Bulletin 17 from The Sulfur Institute from 1970. The Declaration states that the bulletin describes "15-20% of sulfate sulfur into an elemental sulfate fertilizer" as being "adequate to provide immediately available sulfur needed by plants even in severely deficient conditions." Dr. Murphy relied upon such statements and the 1970 publication even though he had available to him a later technical bulletin from The Sulfur Institute, Technical Bulletin 21 from 1974, stating that "at least 25% of the total sulfur applied in the fertilizer should be in a soluble," or sulfate, form.

(c) The Murphy Declaration states that a "close reading of the Bexton patent reveals an ambiguity in the reference regarding the basis for the amount of micronutrient used in the disclosed compositions." In fact, no such ambiguity exists.

(d) The Murphy Declaration states that "Bexton does not explicitly state that the 5% by weight maximum for the micronutrient is based on the micronutrient as elemental micronutrient metal." In fact, the Bexton '303 patent states exactly that. '303 patent at column 3, lines 23-24, and claim 4.

(e) The Murphy Declaration states that a "detailed analysis of the Bexton disclosure confirms that Bexton is referring to a 5% maximum of micronutrient-bearing compounds, rather than micronutrients as elemental metals." In fact, there is no evidence that in referring to a 5% maximum, Bexton is discussing micronutrient-bearing compounds rather than elemental forms of micronutrients, and there is substantial evidence and logic contradicting that assertion.

(f) The Murphy Declaration states, in support of its statement about the Bexton reference to compositions including up to 5% micronutrients, that a contrary view

would require that the composition "would need to include 90% by weight stripped zinc electrolyte," and further states that the contrary view "would be an absurd result" and "an illogical result." In fact, the contrary view requires no such conclusion and is nothing approaching an absurd or illogical result, at least in part because Dr. Murphy's analysis fails to account for the loss of water from the solution in creating the final dry product, and because the Bexton patent describes possible granulating agents and micronutrient sources other than stripped zinc electrolyte. *E.g.*, '303 patent, claim 21.

      (g)     The Murphy Declaration states that "under this correct reading of Bexton, the *maximum* amount of micronutrient as elemental metal micronutrients amounts to .25% [one quarter of one percent] by weight of the fertilizer compositions" (emphasis in original). In fact, Bexton plainly discloses elemental metal micronutrients amounts in quantities twenty times greater than represented by Dr. Murphy, in amounts up to 5% by weight of the fertilizer compositions. '303 patent at column 3, lines 23-24, and claim 4. Furthermore, this statement is contrary to the representation made by Sanders and Collins, amongst others, to the Patent Examiner in the parent application to the '459 patent, during and directly after their February 24, 2000 interview with the Examiner.

     30.    Sanders, Mr. Collins, and Dr. Murphy all were aware of the contents of at least the Bexton patent, along with other relevant information, prior to and at the time that they caused the Murphy Declaration to be submitted to the Patent Office. Because the conduct, statements, and omissions of Drs. Sanders and Murphy were directed to highly material limitations of the '459 patent claims and were clearly false and/or misleading, coupled with the monetary interest that both individuals had in seeing that a patent issued, the inference that the actions described in this Counterclaim were committed with the intent to deceive the Patent Office is compelling.

9

The intentional false and/or misleading material statements and omissions described constitute inequitable conduct and unclean hands sufficient to render the '459 patent unenforceable.

**Other False and Misleading Statements to the Patent Office**

31. Sanders and his patent counsel Mr. Collins submitted additional documents to the Patent Office that contained and reiterated a number of the false and/or misleading statements in the Murphy Declaration, including at least the following false and/or misleading statements:

(a) Sanders and his patent counsel repeated and reiterated false and/or misleading statements in the Murphy Declaration by stating that a "closer reading of the [Bexton] reference establishes that there is a *prima facie* ambiguity in the reference regarding the basis for the amount of micronutrient used in the disclosed compositions." In fact, no such ambiguity exists.

(b) Sanders and his patent counsel repeated and reiterated false and/or misleading statements in the Murphy Declaration by stating that "a close reading and analysis of the Bexton disclosure confirms that Bexton is referring to a 5% maximum of micronutrient-bearing compounds, rather than micronutrients as elemental metals." In fact, there is no evidence that in referring to a 5% maximum, Bexton is discussing micronutrient-bearing compounds rather than elemental forms of micronutrients, and there was substantial evidence available to Sanders and his patent counsel, including the Bexton patent itself, contradicting that assertion.

(c) Sanders and his patent counsel also repeated and reiterated false and/or misleading statements in the Murphy Declaration by stating that the Bexton '303 patent cannot be referring to 5% of micronutrients in elemental form because a contrary view would require that the composition "would need to include 90% by weight stripped zinc

electrolyte," and further states that the contrary view "would be an absurd result" and "an illogical result" In fact, during and directly after their February 24, 2000 interview with the Examiner, Sanders and his patent counsel had previously admitted that Bexton disclosed micronutrients up to a "maximum of about 5% by weight of the fertilizer." The contrary view does not require the conclusion claimed by Dr. Murphy and is nothing approaching an absurd or illogical result, at least in part because Dr. Murphy's analysis fails to account for the loss of water from the solution in creating the final dry product, and because the Bexton patent describes possible granulating agents and micronutrient sources other than stripped zinc electrolyte.

 (d) Sanders and his patent counsel also made false and/or misleading statements by relying upon the Murphy Declaration to claim that it supported their assertion that the manufacturing process described in the Bexton '303 patent could not produce a product with 5% of micronutrients in elemental form, when Dr. Murphy has admitted that he actually lacked any expertise to analyze the Bexton process.

 32. Although in reviewing the draft patent application Dr. Murphy described certain data and conclusions as "SWAGs" - "scientific wild-ass guesses" - and warned Sanders and his counsel that the data "need[] to be determined," Sanders and his counsel reported the data and conclusions to the Patent Office as if they had been tested and confirmed. None of the guesses was altered in the actual patent application, and no documentation indicating any testing or confirmation of the guesses has been identified by Plaintiffs.

 33. Sanders and his patent counsel stated to the Patent Office that "[n]one of the art brought to attention in the parent application [to the '459 application] deals with a boron

micronutrient composition at all," when in fact at least the Young '906 patent at column 7, line 24, explicitly references the possibility of such a composition.

34. In an interview with the Patent Office Examiner on February 24, 2000, in connection with the parent application to the '459 patent, Sanders and his patent counsel distinguished prior art that the Patent Office Examiner had relied upon to reject Sanders' claims. The parties focused upon three references, the Young '906 patent, the O'Connor '297 patent, and the Bexton '303 patent.

35. Sanders and his patent counsel distinguished the Young '906 reference with statements that "Young fails to teach any composition containing free ammonium sulfate together with elemental sulfur and a micronutrient" and "teaches only soluble compounds such as zinc ammonium sulfate, but does not use ammonium sulfate *per se*." They made such statements during the interview with the Patent Office Examiner and afterward, in a February 25, 2000, submission, in similar fashion: "At the interview, it was pointed out that Young did not disclose the use of ammonium sulfate at all, but merely indicates that compounds such as magnesium ammonium sulfate were employed." Those statements were false and/or misleading, because Young explicitly identifies ammonium sulfate as a compound that can be incorporated into the sulfur matrix multiple times. '906 patent at column 8, lines 20-30.

36. Sanders and his patent counsel distinguished the O'Connor '297 reference in their February 25, 2000, submission by stating that it does not describe a "substantially homogeneous" mixture like that claimed by Sanders, but instead describes a "stratified, non-homogeneous fertilizer product which may incidentally include small quantities of trace elements."

37. Sanders and his patent counsel distinguished the Bexton '303 reference in their February 25, 2000, submission on the ground that it "makes clear that he refers only to a minor

amount of trace element, less than 5% by weight," unlike the "high-concentration product as presently claimed."

38.     After distinguishing the Young, O'Connor, and Bexton prior art on the grounds described in the parent application, Sanders and his patent counsel, without disavowing their prior arguments, sought to recapture in the '459 patent as their own invention the same features that they had previously conceded were not their invention at all, because already disclosed in the prior art. Rather than disavow their prior distinguishing arguments, they instead reiterated through their "Preliminary Amendment" and accompanying "Remarks" their prior description of their invention as an "invention . . . concerned with high-concentration micronutrient compositions," the same description they used in distinguishing the Young, O'Connor, and Bexton references in the parent application and to argue that prior art disclosing micronutrient levels up to 5% did not bar issuance of their patent claims.

39.     Despite stating under oath to the Patent Office on December 8, 1998 that "I believe I am the original, first and sole inventor . . . of the subject matter which is claimed and for which a patent is sought," Sanders and his patent counsel submitted, as if they were his own invention, claims so broad that they could not possibly be his invention, including the claim that he had invented a soil nutrient composition that included ammonium sulfate, element sulfur, and any of a number of well-known micronutrients.

40.     Sanders and his counsel Mr. Collins had knowledge of the content of the Bexton, Young, and O'Connor references at the time material statements relating to the references, including references relating to the level of micronutrients in the prior art and other material aspects of the composition of the prior art, were made to the Patent Office. The intentional false

13

and/or misleading material statements and omissions described constitute inequitable conduct and unclean hands sufficient to render the '459 patent unenforceable.

## **DEMAND FOR RELIEF**

WHEREFORE, Defendants/Counterclaim Plaintiffs The Mosaic Company, Cargill, Inc., and Cargill Fertilizer, Inc. request this Court to enter judgment declaring and establishing:

(a) That the Complaint be dismissed with prejudice;

(b) That Defendants' actions do not and have not infringed any claim of the '459 patent;

(c) That the asserted claims of the '459 patent are invalid;

(d) That the '459 patent is unenforceable because of inequitable conduct, and that Plaintiffs are estopped and barred from seeking enforcement of the patent because of their unclean hands and prior statements;

(e) That the case be declared "exceptional" and the Court award Defendants their attorneys' fees and costs; and

(f) That Defendants be awarded such other relief as the Court deems just and proper.

## **JURY DEMAND**

Defendants/Counterclaim Plaintiffs hereby demand trial by jury as to all issues in this action triable of right by a jury.

DORSEY & WHITNEY LLP

Dated: June 3, 2010.　　　　　　　　　　By s/ Peter M. Lancaster
　　　　　　　　　　　　　　　　　　　　　Peter M. Lancaster, MN Bar #0159840
　　　　　　　　　　　　　　　　　　　　　lancaster.peter@dorsey.com
　　　　　　　　　　　　　　　　　　　　　Devan V. Padmanabhan, MN Bar #0240126
　　　　　　　　　　　　　　　　　　　　　padmanabhan.devan@dorsey.com
　　　　　　　　　　　　　　　　　　　　　Heather D. Redmond, MN Bar #0313233
　　　　　　　　　　　　　　　　　　　　　redmond.heather@dorsey.com
　　　　　　　　　　　　　　　　　　　　　Mariah L. Reynolds, MN Bar #0387386
　　　　　　　　　　　　　　　　　　　　　reynolds.mariah@dorsey.com
　　　　　　　　　　　　　　　　　　　Suite 1500, 50 South Sixth Street
　　　　　　　　　　　　　　　　　　　Minneapolis, MN 55402-1498
　　　　　　　　　　　　　　　　　　　Telephone: (612) 340-2600

　　　　　　　　　　　　　　　　　　　STINSON MORRISON HECKER LLP
　　　　　　　　　　　　　　　　　　　J. David Wharton, MO Bar 20347
　　　　　　　　　　　　　　　　　　　dwharton@stinson.com
　　　　　　　　　　　　　　　　　　　Victoria L. Smith, MO Bar 41915
　　　　　　　　　　　　　　　　　　　vsmith@stinson.com
　　　　　　　　　　　　　　　　　　　1201 Walnut, Suite 2500
　　　　　　　　　　　　　　　　　　　Kansas City, MO 64106
　　　　　　　　　　　　　　　　　　　Telephone: 816.842.2600

　　　　　　　　　　　　　　　　　　　*Attorneys for Defendants*
　　　　　　　　　　　　　　　　　　　*The Mosaic Company, Cargill, Inc., and*
　　　　　　　　　　　　　　　　　　　*Cargill Fertilizer, Inc.*

## Certificate of Service

I hereby certify that on June 3, 2010, I caused to be electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

    Jennifer Christine Bailey
    jcb@hoveywilliams.com, ecf@hoveywilliams.com

    Scott R. Brown
    srb@hoveywilliams.com, ecf@hoveywilliams.com

    John M. Collins
    jmc@hoveywilliams.com, ecf@hoveywilliams.com

    Peter M Lancaster
    lancaster.peter@dorsey.com

    Devan V. Padmanabhan
    padmanabhan.devan@dorsey.com, arce.annette@dorsey.com

    Heather D. Redmond
    redmond.heather@dorsey.com, bianchi.rossi.deanna@dorsey.com

    Mariah L. Reynolds
    reynolds.mariah@dorsey.com, motzko.sheila@dorsey.com

    Victoria L. Smith
    vsmith@stinson.com, smithv@stinson.com

    Matthew B. Walters
    mwalters@hoveywilliams.com, ecf@hoveywilliams.com

    J. David Wharton
    dwharton@stinson.com, etassi@stinson.com, lparks@stinson.com,
    nsteele@stinson.com

                                                          s/ Peter M. Lancaster
                                                          Peter M. Lancaster